Duplicate Original

FIRST AMENDMENT OF SUBLEASE

This First Amendment of Sublease is made and entered into as of September 11, 1981 by and between BENEFICIAL STANDARD PROPERTIES, INC., formerly known as BENFID REALTY COMPANY, a California Corporation dba MARINA SHOPPING CENTER ("Lessor") and the UNITED STATES POSTAL SERVICE ("Lessee").

RECITALS

A. On or about February 27, 1981, the parties entered into a written sublease (the "Sublease") of premises located in the County of Los Angeles, State of California and in the Marina Shopping Center developed by Lessor on that portion of Marina Del Rey bounded by Lincoln Boulevard, Fiji Way, Admiralty Way and Mindanao Way, designated by the Department of Small Crafts Harbors of the County of Los Angeles as Parcel 50-R and legally described on Exhibit "A" attached to the Sublease. The portion of the real property described above subleased to Lessee is shown shaded and labelled on the plot plan attached as Exhibit "B" to the Sublease.

B. The parties now desire to amend the Sublease on the terms and conditions hereinafter set forth to provide for a later commencement of the term of the Sublease, to provide for the possibility that certain improvements to the leased premises may not be completed on the lease commencement date and to modify the Sublease in certain other respects as stated herein.

IT IS THEREFORE AGREED:

1. Commencement Date. The first sentence of Article 3 of the Sublease shall be deleted in its entirety and there shall be inserted in its place the following:

"The term of this Lease shall commence on October 1, 1981 and end on September 30, 1986."

2. Construction of Additional Improvements by Lessor. Article 2 of the Sublease shall be deleted in its entirety and there shall be inserted in its place the following:

"2. <u>Construction of Additional Improvements by Lessor.</u> Lessor shall, in accordance with the following procedure, construct or cause to be constructed, in either case at Lessee's sole cost and expense, improvements to the leased premises substantially as described in the preliminary drawing(s) attached hereto as Exhibit E and made a part hereof (hereinafter referred to as the "Improvements"). The Postal Service has approved working drawings and Final plans and specifications based on said preliminary drawings and specifications and the total cost of the Improvements in the amount of $117,000.00. Additionally, the Postal Service has agreed to reimburse Lessor for the cost of preparing the said working drawings and final plans and specifications in the amount of $4,000.00.

Lessor shall commence construction of the Improvements on or about August 1, 1981 and shall construct the Improvements to the leased premises substantially in accordance with the working drawings and final plans and specifications approved by the Postal Service. Lessor shall notify Lessee in writing (i) when the Improvements are approximately 50% completed and (ii) when the Improvements have been substantially completed but prior to final inspection by the County Engineer of Los Angeles County. Upon the notice provided for in (i) and (ii) above, Lesseee shall inspect the Improvements so long as such entry does not interfere with Lessor or Lessor's contractor. Lessee may enter the leased premises on other occasions as long as appropriate arrangements are made in advance with the Lessor.

It is expressly understood and agreed by the parties hereto, that Lessor shall not be required to provide any construction in addition to that set forth in the approved working drawings and final plans and specifications, and that Lessee shall not delay or impede said construction by making changes or alterations therein.

(a) If the Improvements are completed on or before September 30, 1981 the provisions set forth in this paragraph shall apply.

(i) Lessee shall take possession of the leased premises on September 30, 1981. If a Certificate of Occupancy has not been obtained from the County of Los Angeles on that date, Lessor shall cooperate with and assist Lessee so that such certificate is secured as soon as possible thereafter. Lessee's taking possession of the leased premises and acceptance of the leased premises on September 30, 1981 shall not constitute a waiver of any defect in workmanship or material of the Improvements ("Construction Defect"). Lessee shall have ninety (90) days after it has taken possession of the leased premises within which to notify Lessor of any Construction Defect. Lessor shall have sixty (60) days after receipt of such notification within which to correct or remedy any Construction Defect.

(ii) On or about September 29, 1981, Lessor will deliver to Lessee, Lessor's invoice for the total cost of the Improvements to the leased premises (which cost shall be $117,000.00) and Lessor's cost of preparing the working drawings and final plans and specifications in the amount of $4,000.00.

(iii) Within thirty (30) days of receipt of Lessor's invoice, Lessee shall pay Lessor the full amount thereof, which amount shall be $121,000.00.

(b) If in Lessor's sole judgement it does not appear that the Improvements can be completed on or before September 30, 1981 the provisions set forth in this paragraph (b) shall apply.

(i) On September 25, 1981, by written notice delivered by messenger to Lessee no later than 3:00 P.M. on that date, at the address for receiving notices contained in Article 48 hereof, Lessor shall advise Lessee that the Improvements cannot be completed by September 30, 1981. Such notice shall also contain Lessor's estimate

of the percentage of completion of the Improvements as of 5:00 P.M. on September 24, 1981 and Lessor's estimate of the percentage of completion of the Improvement as of September 29, 1981. Lessor shall continue the construction of the Improvements until 5:00 P.M. September 29, 1981.

(ii) On September 30, 1981, Lessor and Lessee by their duly authorized agents shall inspect the leased premises and Lessor and Lessee shall mutually agree on the percentage of completion of the Improvements, and Lessor shall deliver possession of the leased premises to Lessee and Lessee agrees to accept the leased premises in its condition existing as of that date. Notwithstanding such delivery and acceptance, Lessor shall cooperate with and assist Lessee in securing a Certificate of Occupancy from the County of Los Angeles and Lessee's taking possession of the leased premises shall not constitute a waiver of any defect in workmanship or material respecting work done or materials furnished by Lessor. (Construction Defect). Lessee shall have ninety (90) days after it has taken possession of the leased premises within which to notify Lessor of any Construction Defect. Lessor shall have sixty (60) days after receipt of such notification within which to correct or remedy any Construction Defect.

(iii) On or about September 29, 1981, Lessor shall deliver to Lessee, Lessor's invoice for the cost of the improvements to the leased premises made by Lessor (which cost shall be $117,000.00 multiplied by the percentage of completion agreed upon by Lessor and Lessee as provided in sub-paragraph (ii) hereof) and Lessor's cost of preparing the working drawings and final plans and specifications in the amount of $4,000.00.

(iv) Within thirty (30) days of receipt of Lessor's invoice, Lessee shall pay Lessor the full amount thereof.

3. Survival of Other Lease Provisions. Except as set forth in this First Amendment of Sublease all of the provisions of the Sublease shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment of Sublease on the date first above written.

UNITED STATES POSTAL SERVICE

BY: [signature]

BY: ______________________

"LESSEE"

BENEFICIAL STANDARD PROPERTIES, INC., a California Corporation (formerly known as BENFED REALTY COMPANY)

BY: [signature]
Harry Epstein, Its President

BY: [signature]
Marcus Loew, Its Authorized Agent

"LESSOR"

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARINA WATERSIDE, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 06-497C |
| v. | ) | (Judge Horn) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**JOINT APPENDIX OF EXHIBITS**

**VOLUME 2**
**PAGES 47-89**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

OF COUNSEL:

Michael Kiely
OGC
U.S. Postal Service

JOAN M. STENTIFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0341

Attorneys for Defendant

Dated: December 22, 2006

ORIGINAL

SECOND SUBLEASE AMENDMENT

THIS SUBLEASE AMENDMENT made and entered into this 23 day of July, 1990, by and between United States Postal Services ("Tenant") and Carlisle Realty Holdings I, limited partnership, as successor in interest to Benequity Properties, a California corporation ("Landlord").

W I T N E S S E T H

WHEREAS, Landlord and Tenant have entered into a Sublease dated February 27, 1981 for the premises known as 4736-4738 Admiralty Way, Marina del Rey, California ("Lease"); and have further amended this Sublease by First Amendment to Sublease dated September 11, 1981, and furthermore by Sublease Amendment dated May 16, 1988; and

WHEREAS, Landlord and Tenant are desirous of amending certain provisions of the Lease:

NOW, THEREFORE, in consideration of their mutual covenants herein set forth, the parties agree as follows:

1. Article 1 of the Sublease dated February 27, 1981 shall be amended to reflect the relocation of Lessee's Premises from 4736-4738 Admiralty Way to 4748 Admiralty Way shown on Exhibit B attached hereto which contains approximately ~~5,136~~ 5119 square feet.

2. Construction of Improvements. Article 2 of the First Amendment of Sublease dated September 11, 1981 shall be deleted in its entirety and there shall be inserted in its place the following:

"2. Construction of Improvements. USPS shall construct or cause to be constructed, in either case at the sole expense of the USPS, improvements to the leased premises. Design drawings will be presented to the Lessor for review prior to the commencement of construction. Lessor will review drawings in a timely manner but in no case shall Lessor have more than two weeks to review said drawings.

Lessor will deliver possession of the Premises on July 1, 1990 via notice by Certified Mail stating that the Premise is in the following condition:

A. The southerly demising wall shall be constructed in accordance with United States Postal security requirements as outlined in USPS RE-5 and attached hereto as "Attachment A".

B. The north easterly wall consisting of 54'9" length by 2'6" depth, shall be constructed in accordance with United States Postal security requirements as outlined in USPS RE-5 and attached hereto as "Attachment A".

C. Existing plumbing will be stubbed.

D. Electrical panel shall be delivered "as is".

E. A handicapped accessible ramp in accordance with USPS RE-4 requirements shall be provided by Lessor within Fifty (50) feet of the new premises. Said RE-4 requirements are attached hereto as "Attachment B".

F. A handicapped parking space in accordance with USPS RE-4 requirements shall be provided by Lessor within Fifty (50) feet of the new premises. Said RE-4 requirements are attached hereto as "Attachment B".

If delivery of such notice is delayed beyond July 1, 1990 than the provisions of Paragraph 3 of this Amendment shall be postponed by the number of days between July 1, 1990, and actual delivery of such notice."

3. Term and Commencement Date. Article 5 of the Sublease as amended by Article 1 of the Sublease Amendment is modified as follows:

"1. The term of the Sublease shall be for five (5) years and shall commence on October 1, 1990 and end on September 30, 1995.

There shall be one five (5) year Renewal Option that shall commence October 1, 1995 and end on September 30, 2000."

4. Article 7, as amended by Article 2 of Sublease Amendment dated May 16, 1988, is hereby deleted in its entirety and the following shall be substituted therefore:

"Lessee shall pay to Lessor, in the manner provided in Article 6 of the sublease, a fixed minimum monthly rent as follows:

a) Eleven Thousand Seven Hundred and Fifty Dollars ($11,750.00) from October 1, 1990 through September 30, 1993;

b) Thirteen Thousand Eight Hundred Sixty Five Dollars ($13,865.00) from October 1, 1993 through September 30, 1995; Thirteen Thousand Eight Hundred Sixty Five Dollars ($13,865.00) from October 1, 1995 through September 30, 1996;

c) Sixteen Thousand Three Hundred Dollars ($16,300.00) from October 1, 1996 through September 30, 1999; and

d) Nineteen Thousand Three Hundred and Five Dollars ($19,305.00) from October 1, 1999 through the term of this Amendment".

5. The Lessee shall continue to pay rent on the existing premise location under Article 7 of Sublease Amendment dated May 15, 1988 until Lessee actually vacates the premise. The intent of this Article is to allow Lessee Ninety (90) days for construction of Tenant Improvements on the new Premises. Rent would then begin on the new premise and may concurrently continue to be paid on the old premise until it is physically surrendered.

All other provisions, terms and conditions of the Lease shall remain the same and in full force and effect.

IN TESTIMONY WHEREOF, Landlord and Tenant have caused this Sublease Amendment to be signed, as of the 15th day of June, 1990.

"TENANT"

United States Postal Service

[signature]

VINCENT P. MACIORSKI
Manager, Real Estate Branch
7/23/90

"LANDLORD"

Carlisle Realty Holdings I, limited partnership

[signature]

Richard G. Fownes
President
Marina General Partner, Inc.

EXHIBIT B

PLOT PLAN OF PREMISES




EXHIBIT "B"

and before the cabinetwork is installed in the facility. The postmaster must maintain control of these keys in order to prevent potential loss problems. All locks must be individually keyed.

## 250 Mail Security

## 251 Lobbies (Box, Service, and Self-Service)

### 251.1 Design

*a.* The service lobby generally is open to customers eight or more hours a day, while the self-service and box lobbies may be open twenty-four a day. USPS is required to provide adequate protection to customers and employees using these lobbies. Failure to design and maintain a minimal level of security may result in USPS liability and subsequent court action.

*b.* Lobbies must be designed to provide a means of securing the service lobby and service counter area during the hours they are closed. The service and box lobbies must be designed to be visible from the exterior of the building to discourage vandalism and other criminal activity. The service lobby can be secured by providing either doors or a rolling grille separating the self-service and box lobbies from the service lobby.

*c.* Post-office-box, self-service, and service lobbies must contain adequate window (storefront) area to permit the interior to be easily observed from the street or customer drive. Glass brick and glass block are not acceptable for lobby windows.

### 251.2 Discouraging Illegal Entry

To discourage illegal entry into the closed service lobby or workroom from the box and self-service lobbies, provide the following as applicable (also see sections 244.3, Locks; 244.41 Wicket Doors; and 244.43, Exterior Doors):

*a.* The walls and partitions separating the box and self-service lobbies from the service lobby, workroom, and administrative areas must extend to the underside of the structural slab or roof structure above. These walls and partitions should be constructed soundly and strong enough to discourage illegal entry. The security wall must have (as a minimum) 2" x 4" wood or 3 5/8-inch, 20-gauge metal upright studs spaced eight inches OC and covered on both sides with five-eighth-inch gypsum board. As an alternative, the studs may be spaced sixteen inches OC if a layer of three-eighth-inch plywood or 22-gauge rolled steel sheet is installed under the gypsum board on the lobby side. If code permits, 2" x 4" wood, upright studs spaced sixteen inches OC or 3 5/8 inch, 20-gauge, metal studs spaced twenty-four inches OC and covered with three-quarter-inch tongue-and-groove plywood may be used on the lobby side and finished inside. Ensure that wall continuity is maintained from the finished floor to the underside of the structural slab or the roof deck above.

*b.* A dropped ceiling may be used provided the walls prevent access to the workroom floor from the box lobby as outlined in section 251.2a. If a permanent ceiling is installed, it must be of nonremovable construction and not penetrable by access hatches, recessed light fixtures, or mechanical grilles or diffusers. Openings larger than eight inches on a side must be secured above the ceiling with bars or grilles per section 241.1, Skylights and Clerestory Windows. The ceiling must be constructed of 2" x 4" wood studs spaces sixteen inches OC or 3 5/8 inches, 20-gauge, metal study on twenty-four-inch centers covered with three-quarter-inch tongue-and-groove plywood covered with five-eighth-inch gypsum board. As an alternative, space 2" x 4" wood studs or 3 5/8 inch, 20 gauge, metal studs covered with five-eighth-inch gypsum board at eight inches OC. A steel suspension system with metal lath and plaster is acceptable for secure ceiling construction. The construction must comply with building code requirements.

*c.* If existing facilities are found to have walls, partitions, or removable ceiling deficiencies, make corrections. The security wall above the accessible suspended ceiling (as a minimum) must be constructed of material equal to the existing security walls. The security wall must have (as a minimum) 2" x 4" upright wood studs spaced eight inches OC, covered on both sides with five-eighth-inch gypsum board. If allowed by the building code, a three-quarter-inch tongue-and-groove plywood may be used in place of gypsum board. Ensure that wall continuity is maintained from the finished floor to the underside of the structural slab or the roof deck above.

*d.* Ensure that the service lobby entry doors are not removable from the public side.

*e.* Transfer grilles and HVAC duct penetration(s) where the smallest dimension exceeds eight inches must be secured using either security bars,




*Fig. 8(f)*
*Carpet Tile Thickness*




*Fig. 8(g)*
*Gratings*




*Fig. 8(h)*
*Grating Orientation*

### 4.6 Parking and Passenger Loading Zones.

**4.6.1 Minimum Number.** *Parking spaces required to be accessible by 4.1 shall comply with 4.6.2 through 4.6.4. Passenger loading zones required to be accessible by 4.1 shall comply with 4.6.5 and 4.6.6.*

**4.6.2 Location.** Parking spaces for disabled people and accessible passenger loading zones that serve a particular building shall be *the spaces or zones located closest to the nearest accessible entrance on an accessible route.* In separate parking structures or lots that do not serve a particular building, parking spaces for disabled people shall be located on the shortest possible circulation route to an accessible pedestrian entrance of the parking facility.

**4.6.3* Parking Spaces.** Parking spaces for disabled people shall be at least 96 in (2440 mm) wide and shall have an adjacent access aisle 60 in (1525 mm) wide minimum (see Fig. 9). Parking access aisles shall be part of an accessible route to the building or facility entrance and shall comply with 4.3. Two accessible parking spaces may share a common access aisle. Parked vehicle overhangs shall not reduce the clear width of an accessible circulation route. *Parking spaces and access aisles shall be level with surface slopes not exceeding 1:50 in all directions.*

*EXCEPTION: If accessible parking spaces for vans designed for handicapped persons are provided, each should have an adjacent access aisle at least 96 in (2440 mm) wide complying with 4.5, Ground and Floor Surfaces.*

**4.6.4* Signage.** Accessible parking spaces shall be designated as reserved for the disabled by a sign showing the symbol of accessibility (see 4.30.5). Such signs shall not be obscured by a vehicle parked in the space.




Fig. 9
Dimensions of Parking Spaces

**4.7.3 Width.** The minimum width of a curb ramp shall be 36 in (915 mm), exclusive of flared sides.

**4.7.4 Surface.** Surfaces of curb ramps shall comply with 4.5.

**4.7.5 Sides of Curb Ramps.** If a curb ramp is located where pedestrians must walk across the ramp, *or where it is not protected by handrails or guardrails*, then it shall have flared sides; the maximum slope of the flare shall be 1:10 (see Fig. 12(a)). Curb ramps with returned curbs may be used where pedestrians would not normally walk across the ramp (see Fig. 12(b)).

**4.7.6 Built-up Curb Ramps.** Built-up curb ramps shall be located so that they do not project into vehicular traffic lanes (see Fig. 13).




Fig. 13
Built-Up Curb Ramp

**4.7.7 Warning Textures.** *(Removed and reserved).*

**4.7.8 Obstructions.** Curb ramps shall be located or protected to prevent their obstruction by parked vehicles.

**4.7.9 Location at Marked Crossings.** Curb ramps at marked crossings shall be wholly contained within the markings, excluding any flared sides (see Fig. 15).

**4.7.10 Diagonal Curb Ramps.** If diagonal (or corner type) curb ramps have returned curbs or other well-defined edges, such edges shall be parallel to the direction of pedestrian flow. The bottom of diagonal curb ramps shall have 48 in (1220 mm) minimum clear space as shown in Fig. 15(c) and (d). If diagonal curb ramps are provided at marked crossings, the 48 in (1220 mm) clear space shall be within the markings (see Fig. 15(c) and (d)). If diagonal curb ramps have flared sides, they shall also have at least a 24 in (610 mm) long segment of straight curb located on each side of the curb ramp and within the marked crossing (see Fig. 15(c)).

**4.7.11 Islands.** Any raised islands in crossings shall be cut through level with the street or have curb ramps at both sides and a level area at least 48 in (1220 mm) long in the part of the island intersected by the crossings (see Fig. 15(a) and (b)).

**4.7.12 Uncurbed Intersections.** *(Removed and reserved).*

## 4.8 Ramps.

**4.8.1* General.** Any part of an accessible route with a slope greater than 1:20 shall be considered a ramp and shall comply with 4.8.

**4.8.2* Slope and Rise.** The least possible slope shall be used for any ramp. The maximum slope of a ramp in new construction shall be 1:12. The maximum rise for any run shall be 30 in (760 mm) (see Fig. 16). Curb ramps and ramps to be constructed on existing sites or in existing buildings or facilities may have slopes and rises as shown in Table 2 if space limitations prohibit the use of a 1:12 slope or less (see *4.1.6).*

**4.8.3 Clear Width.** The minimum clear width of a ramp shall be 36 in (915 mm).

**4.8.4 Landings.** Ramps shall have level landings at the bottom and top of each run. Landings shall have the following features:

(1) The landing shall be at least as wide as the ramp run leading to it.

(2) The landing length shall be a minimum of 60 in (1525 mm) clear.

(3) If ramps change direction at landings, the minimum landing size shall be 60 in by 60 in (1525 mm by 1525 mm).

(4) If a doorway is located at a landing, then the area in front of the doorway shall comply with 4.13.6.

**4.8.5* Handrails.** If a ramp run has a rise greater than 6 in (250 mm) or a horizontal projection greater than 72 in (1830 mm), then it shall have handrails on both sides. Handrails are not required on curb ramps. Handrails shall comply with 4.26 and shall have the following features:

(1) Handrails shall be provided along both sides of ramp segments. The inside handrail on switchback or dogleg ramps shall always be continuous.

(2) If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top and bottom of the ramp segment and shall be parallel with the floor or ground surface.

(3) The clear space between the handrail and the wall shall be 1-1/2 in (38 mm).

(4) Gripping surfaces shall be continuous.

(5) *Top of handrail gripping surfaces shall be mounted between 30 in and 34 in (760 mm and 865 mm) above ramp surfaces.*

(6) *Ends of handrails shall be either rounded or returned smoothly to floor, wall, or post.*

(7) *Handrails shall not rotate within their fittings.*

4.8 Ramps




Fig. 15
Curb Ramps at Marked Crossings




| | Maximum Rise | | Maximum Horizontal Projection | |
|---|---|---|---|---|
| Slope | in | mm | ft | m |
| 1:12 to < 1:16 | 30 | 760 | 30 | 9 |
| 1:16 to < 1:20 | 30 | 760 | 40 | 12 |

**Fig. 16**
**Components of a Single Ramp Run and Sample Ramp Dimensions**

**4.8.6 Cross Slope and Surfaces.** The cross slope of ramp surfaces shall be no greater than 1:50. Ramp surfaces shall comply with 4.5.

**4.8.7 Edge Protection.** Ramps and landings with drop-offs shall have curbs, walls, railings, or projecting surfaces that prevent people from slipping off the ramp. Curbs shall be a minimum of 2 in (50 mm) high (see Fig. 17).

**4.8.8 Outdoor Conditions.** Outdoor ramps and their approaches shall be designed so that water will not accumulate on walking surfaces.

## 4.9 Stairs.

**4.9.1 Minimum Number.** Stairs *required to be accessible by 4.1 shall comply with 4.9.*

**4.9.2 Treads and Risers.** On any given flight of stairs, all steps shall have uniform riser heights and uniform tread widths. Stair treads shall be no less than 11 in (280 mm) wide, measured from riser to riser (see Fig. 18(a)). *Open risers are not permitted on accessible routes.*

**4.9.3 Nosings.** The undersides of nosings shall not be abrupt. The radius of curvature at the leading edge of the tread shall be no greater than 1/2 in (13 mm). Risers shall be sloped or the underside of the nosing shall have an angle not less than 60 degrees from the horizontal. Nosings shall project no more than 1-1/2 in (38 mm) (see Fig. 18).

**4.9.4 Handrails.** Stairways shall have handrails at both sides of all stairs. Handrails shall comply with 4.26 and shall have the following features:

(1) Handrails shall be continuous along both sides of stairs. The inside handrail on switchback or dogleg stairs shall always be continuous (see Fig. 19(a) and (b)).

(2) If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top riser and at least 12 in (305 mm) plus the width of one tread beyond the bottom riser. At the top, the extension shall be parallel with the floor or ground surface. At the bottom, the handrail shall continue to slope for a distance of the width of one tread from the bottom riser; the remainder of the extension shall be horizontal (see Fig. 19(c) and (d)). Handrail extensions shall comply with 4.4.

(3) The clear space between handrails and wall shall be 1-1/2 in (38 mm).

(4) Gripping surfaces shall be uninterrupted by newel posts, other construction elements, or obstructions.

(5) *Top of handrail gripping surface shall be mounted between 30 in and 34 in (760 mm and 865 mm) above stair nosings.*

(6) *Ends of handrails shall be either rounded or returned smoothly to floor, wall, or post.*

(7) *Handrails shall not rotate within their fittings.*

**4.9.5 Tactile Warnings at Stairs.** *(Removed and reserved).*

**4.9.6 Outdoor Conditions.** Outdoor stairs and their approaches shall be designed so that water will not accumulate on walking surfaces.

# THIRD SUBLEASE AMENDMENT

This sublease amendment is made and entered into on this 22nd day of July, 1996 by and between United States Postal Service ("Tenant") and Carlisle Realty Holdings I. limited partnership, ("Landlord"):

WHEREAS, Landlord and Tenant have entered into a Sublease dated February 27, 1981 for the property known as 4736-4738 Admiralty Way, Marina Del Rey, California ("Lease"); and have further amended this sublease by First Amendment to Sublease dated September 11, 1981, and furthermore by Sublease Amendment dated May 16, 1988; and furthermore by Second Sublease Amendment dated July 23, 1990; and

WHEREAS, Landlord and Tenant are desirous of amending certain provisions of the lease:

NOW THEREFORE, in consideration of their mutual covenants herein set forth, the parties agree as follows:

UPON the receipt of notice by certified mail that Tenant has received the appraisal results as specified in the "Binding Agreement for an MAI Appraisal" and notice that Tenant is willing and able to obtain the funding at such appraised value, the following lease modifications shall be made:

1. Term and Commencement Date. Article 5 of the Sublease as amended by Article 1 of the Sublease Amendment and as further amended by Article 3 of the Second Sublease Amendment is modified as follows:

There shall be a new five year lease extension which shall commence on October 1, 1995 and end on September 30, 2000. *

2. Article 4 of the Second Sublease Amendment dated July 23, 1990 shall be amended to reflect the rental derived from the Binding Agreement for an MAI Appraisal.

3. Relocation. Landlord reserves the right to relocate the Premises to 4766 Admiralty Way which is approximately 5,545 square feet. Total rent shall be adjusted to reflect any difference in size. The Binding Agreement for an MAI Appraisal shall request a per foot rent for both the existing location and the new location. Rent will be adjusted upon the date of possession of the new location by Tenant. Landlord agrees to pay the design costs, construction costs, and signage moving costs. Tenant will pay incidental moving costs. Tenant will be given sixty and thirty day notices of the anticipated completion date. Landlord and Tenant will coordinate the relocation of the Tenant to minimize disruption in Tenant's operations.

Should Tenant be required by their agency to provide a "retail store" facility, Landlord will contribute $125,610 dollars toward the construction costs.

[signature]
Richard Fownes, President
Marina Associates, Inc.

7-15-96
Date

[signature]
Marni Gagne, Contracting Officer
U.S. Postal Service

7/22/96
Date

57



* ~~Once~~ THE RENT HAS BEEN ESTABLISHED BY THE MAI APPRAISAL, TOTAL CUMULATIVE RENT SHALL BE CALCULATED FROM 10-1-95 TO THAT DATE. IF CALCULATED RENT EXCEEDS ACTUAL PAYMENTS, THE POSTAL SERVICE SHALL SUBMIT PAYMENT FOR THE DEFICIT UPON RECEIPT OF AN ~~Bill~~ INVOICE. IF PAYMENTS FOR THE PERIOD EXCEED TOTAL AMOUNTS DUE, LANDLORD WILL ISSUE A CREDIT [illegible]

ADDENDUM "A"

THE POSTAL SERVICE LEGAL DEPARTMENT HAS REVIEW YOUR REQUESTED CHANGES AND HAS APPROVED THEM WITH THE FOLLOWING CHANGES/REVISIONS:

THE CHANGE TO THE END OF THE NEXT TO LAST PARAGRAPH OF THE BINDING AGREEMENT FOR AN MAI APPRAISAL IS APPROVED WITH THE FOLLOWING CHANGE:

YOU REQUESTED: "AND THIS AGREEMENT WILL BE NULL AND VOID WITH BOTH PARTIES RESERVING WHATEVER RIGHTS EXIST UNDER PRESENT AGREEMENTS. TENANT WILL REVERT TO A MONTH-TO-MONTH TENANCY."

THE POSTAL SERVICE LEGAL DEPARTMENT HAS APPROVED:

"AND THIS AGREEMENT WILL BE NULL AND VOID WITH BOTH PARTIES RESERVING WHATEVER RIGHTS EXIST UNDER PRESENT AGREEMENTS. TENANCY WILL REVERT TO A MONTH-TO-MONTH TENANCY."

THE CHANGE TO THE SECOND PARAGRAPH OF ITEM 1 IN THE THIRD SUBLEASE AMENDMENT IS APPROVED WITH THE FOLLOWING CHANGE:

YOU REQUESTED: "" ONCE THE RENT HAS BEEN ESTABLISHED BY THE MAI APPRAISAL, TOTAL CUMULATING RENT SHALL BE CALCULATED FROM 10/1/95 TO THAT DATE. IF CALCULATED RENT EXCEEDS ACTUAL PAYMENTS, THE POSTAL SERVICE SHALL SUBMIT PAYMENT FOR THE DEFICIT UPON RECEIPT OF AN INVOICE. IF PAYMENTS FOR THE PERIOD EXCEED TOTAL AMOUNTS DUE, LANDLORD WILL ISSUE A CREDIT."

THE POSTAL SERVICE LEGAL DEPARTMENT HAS APPROVED:

""ONCE THE RENT FOR THE LEASE TERM BEGINNING OCTOBER 1, 1995 IS ESTABLISHED, THE TOTAL AMOUNT DUE FROM OCTOBER 1, 1995 TO THE EFFECTIVE DATE OF THE REVISED RENTAL PAYMENT WILL BE CALCULATED. THE PAYMENT WILL BE ADJUSTED IN THE FOLLOWING MANOR. IF A DEFICIT EXISTS, THE POSTAL SERVICE SHALL PAY THE DEFICIT (DIFFERENCE BETWEEN THE AMOUNT PAID SINCE OCTOBER 1, 1995 AND THE RENTAL VALUE ESTABLISHED BY THIS APPRAISAL), NO LATER THAN SIXTY DAYS FROM THE EFFECTIVE DATE OF THE SIGNED AND ACCEPTED LEASE AMENDMENT. IF A SURPLUS EXISTS, THE LESSOR SHALL ISSUE A CREDIT TO THE POSTAL SERVICE FOR THE DIFFERENCE BETWEEN THE TWO AMOUNTS WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE SIGNED AND ACCEPTED LEASE AMENDMENT."


MINDANAO WAY
ADMIRALTY WAY
MARINA WATERSIDE
Admiralty Way and Mindanao
Marina Del Rey, California 90292
27,451
Marina Market
Marina Photo
Petite Cafe Casino
M. Fredric Outlet
Carlton Hair
Lacy Lady
Homebody
Penguins Yogurt
Mrs. Fields Cookies
M. Fredric Kids
Seymour Jewelers
Marina Fine Arts
Dr. Ernest Nankas
The Drug Store
West Coast Video
M. Fredric & Co.
Johnnies Coffee
Nicole
Tobacco Trader
M. Fredric Active
Jenny Craig
Top to Top
One Step Ahead
Designer Labels for Men
Designer Labels
Waterside Beauty
Jeannes Hallmark
Monique
USPO
Vacant
1,200
1,500
1,500
1,400
900
900
1,320
600
900
900
1,200
1,080
6,000
3,938
1,836
600
1,600
1,200
800
2,400
1,200
1,183
2,960
4,800
3,300
1,350
1,800
1,800
5,119
6,200
7,070
Bank of America
Rainbow Acres
2,800
Marina Cleaners
2,000
Marina Travel
1,934
West Marine Products
5,545
C. Valmy Skin Care Salon
1975
Crown Books
2,800
Pier 1 Imports
7,000
California Pizza Kitchen
4,040
FIJI WAY

PAGE 2 OF 3




ADMIRALTY

PAGE 3 OF 3

*BINDING AGREEMENT FOR AN MAI APPRAISAL*

This Agreement is made and entered into on this 22nd day of July 1996 between Carlisle Realty Holding I. (Landlord) for the property known as the Postal Service Marina Del Rey Branch, located at the Marina Waterside Shopping Center, Marina Del Rey, CA, and the United States Postal Service (Tenant).

The Landlord and Tenant are executing this Agreement in conjunction with the Third Lease Amendment of the same date for subject property.

*The parties mutually agree as follows:*

Both parties agree to proceed with an appraisal by an MAI appraiser to establish a net fair market rental value binding on both parties as outlined below.

The Postal Service has provided the Landlord with a list of four MAI designated appraisers in the Marina Del Rey area, dated November 9th, copy enclosed. The Landlord will select one appraiser from this list to perform the appraisal.

The appraiser will complete a draft of the appraisal for both the Postal Service and the Landlord to review and comment on. Any comments by the Postal Service and/or Landlord must be given to the appraiser within fifteen (15) days. The appraiser will then finalize the appraisal, which will be binding on both parties. Two complete copies of the appraisal will be presented to both the Landlord and Tenant.

By execution of this Agreement, both the Landlord and Tenant agree this appraisal will establish the net annual fair market rent for a five year lease term, and that it will be binding upon both parties, except as follows: In the event the Postal Service can not obtain the funding to lease the space at the appraised value, the Postal Service will pay the full cost of the appraisal. If the appraisal is greater than the renewal option rents, Lessor agrees to accept the renewal option rents as net fair market rent for a five year lease. Furthermore, should the appraisal establish a net annual rent value of under $110,000, Lessor may require, subject to the other conditions stated in this paragraph, an annual net rental payment of $110,000.

The cost of the appraisal will be equally shared by both the Landlord and Tenant with each the Landlord and Tenant liable for payments of one half the invoice directly to the appraiser. If the Postal Service can not obtain the funding to lease the space at the appraised value, the Postal Service will be liable for the full cost of the appraisal, AND THIS AGREEMENT WILL BE NULL AND VOID WITH BOTH PARTIES RESERVING WHATEVER RIGHTS EXIST UNDER PRESENT AGREEMENTS. TENANT WILL REVERT TO A MONTH-TO-MONTH TENANCY.

*INSTRUCTIONS TO THE APPRAISER:* The appraisal must be completed and/or thoroughly reviewed by the contracted MAI appraiser. The contracted MAI appraiser must sign and date the appraisal, in addition to any other parties who worked on the appraisal. The appraisal will be for rental value based on similar properties in the Marina Del Rey area. The Appraisal will be a full narrative appraisal prepared following the Postal Service Specifications for the Analytical Narrative Appraisal Report (made a part of this agreement). The appraisal is to determine a net fair market rental value. The appraiser must have all instructions in writing and signed by both Richard Fownes for the Landlord and Marni Gagne for the Tenant. A draft of the appraisal is to be given to both the Postal Service and Landlord for comments. All comments must be given to the appraiser within fifteen days after receipt of the draft. The appraiser will then finalize the appraisal.

| | |
|---|---|
| Richard Fownes, President and of Marina General Partner, Inc. | Marni Gagne, Contracting Officer, Postal Service |
| 7-15-96 | 7/22/96 |
| Date | Date |

JAN-07-'00 SAT 00:21 ID: TEL NO: #020 P02

ADDENDUM "A"

THE POSTAL SERVICE LEGAL DEPARTMENT HAS REVIEW YOUR REQUESTED CHANGES AND HAS APPROVED THEM WITH THE FOLLOWING CHANGES/REVISIONS:

THE CHANGE TO THE END OF THE NEXT TO LAST PARAGRAPH OF THE BINDING AGREEMENT FOR AN MAI APPRAISAL IS APPROVED WITH THE FOLLOWING CHANGE:

YOU REQUESTED: "AND THIS AGREEMENT WILL BE NULL AND VOID WITH BOTH PARTIES RESERVING WHATEVER RIGHTS EXIST UNDER PRESENT AGREEMENTS. TENANT WILL REVERT TO A MONTH-TO-MONTH TENANCY."

THE POSTAL SERVICE LEGAL DEPARTMENT HAS APPROVED:

"AND THIS AGREEMENT WILL BE NULL AND VOID WITH BOTH PARTIES RESERVING WHATEVER RIGHTS EXIST UNDER PRESENT AGREEMENTS. TENANCY WILL REVERT TO A MONTH-TO-MONTH TENANCY."

THE CHANGE TO THE SECOND PARAGRAPH OF ITEM 1 IN THE THIRD SUBLEASE AMENDMENT IS APPROVED WITH THE FOLLOWING CHANGE:

YOU REQUESTED: "* ONCE THE RENT HAS BEEN ESTABLISHED BY THE MAI APPRAISAL, TOTAL CUMULATING RENT SHALL BE CALCULATED FROM 10/1/95 TO THAT DATE. IF CALCULATED RENT EXCEEDS ACTUAL PAYMENTS, THE POSTAL SERVICE SHALL SUBMIT PAYMENT FOR THE DEFICIT UPON RECEIPT OF AN INVOICE.. IF PAYMENTS FOR THE PERIOD EXCEED TOTAL AMOUNTS DUE, LANDLORD WILL ISSUE A CREDIT"

THE POSTAL SERVICE LEGAL DEPARTMENT HAS APPROVED:

"*ONCE THE RENT FOR THE LEASE TERM BEGINNING OCTOBER 1, 1995 IS ESTABLISHED, THE TOTAL AMOUNT DUE FROM OCTOBER 1, 1995 TO THE EFFECTIVE DATE OF THE REVISED RENTAL PAYMENT WILL BE CALCULATED. THE PAYMENT WILL BE ADJUSTED IN THE FOLLOWING MANOR. IF A DEFICIT EXISTS, THE POSTAL SERVICE SHALL PAY THE DEFICIT (DIFFERENCE BETWEEN THE AMOUNT PAID SINCE OCTOBER 1, 1995 AND THE RENTAL VALUE ESTABLISHED BY THIS APPRAISAL), NO LATER THAN SIXTY DAYS FROM THE EFFECTIVE DATE OF THE SIGNED AND ACCEPTED LEASE AMENDMENT. IF A SURPLUS EXISTS, THE LESSOR SHALL ISSUE A CREDIT TO THE POSTAL SERVICE FOR THE DIFFERENCE BETWEEN THE TWO AMOUNTS WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE SIGNED AND ACCEPTED LEASE AMENDMENT."

Page 1.A.